# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs May 20, 2014

## STATE OF TENNESSEE v. MORRIS MARSH

### Appeal from the Criminal Court for Johnson County
### No. 5066    Robert E. Cupp, Judge

### No. E2013-01343-CCA-R3-CD - Filed September 4, 2014

The Defendant, Morris Marsh, was convicted by a jury of first degree premeditated murder and sentenced to life imprisonment with the possibility of parole. See Tenn. Code Ann. § 39-13-202. In this appeal as of right, the Defendant contends (1) that the trial court erred in denying the Defendant's motion to suppress his statement given to an investigator; (2) that the trial court erred in denying the Defendant's motion to dismiss the presentment against him; (3) that the trial court erred in denying the Defendant's pro se motion to remove his appointed trial counsel; (4) that the State failed to disclose an incriminating statement made by the Defendant to a witness; (5) that the trial court erred in admitting audio recordings of prison phone calls made by the Defendant; (6) that the trial court erred in admitting an autopsy photograph of the victim; (7) that the trial court erred in determining that a witness was unavailable and allowing the witness's preliminary hearing testimony to be presented at trial; (8) that the evidence was insufficient to sustain the Defendant's conviction; and (9) that the State committed prosecutorial misconduct during its closing argument.[1] Following our review, we affirm the judgment of the trial court.

**Tenn. R. Crim. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL, J., and JEFFREY S. BIVINS, SP.J., joined.

Jeffery C. Kelly, District Public Defender (at trial); William Donaldson, Assistant Public Defender (at trial); and Steve McEwen, Mountain City, Tennessee (on appeal), for the appellant, Morris Marsh.

Robert E. Cooper, Jr., Attorney General and Reporter; Michelle L. Consiglio-Young, Assistant Attorney General; Anthony Wade Clark, District Attorney General; Dennis Dwayne

---

[1]For the sake of clarity, we have renumbered and reordered the issues as stated by the Defendant in his brief.

Brooks and Matthew Edward Roark, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

FACTUAL BACKGROUND[2]

This case arises from the murder of an inmate, Roshad Siler, at the Northeast Correctional Complex (NECX) on September 1, 2006. The Defendant was tried for the murder along with two co-defendants, Sean Jordan and Brian Roberson,[3] in December 2011. At trial, Jonathan Franklin testified that he was a correctional officer working at NECX on September 1, 2006. Around 3:30 p.m., Officer Franklin was in a cage in the center of Unit 12 when he heard the sound of "sneaker[s] squeaking and shuffling on the concrete." Officer Franklin looked up to see the victim, the Defendant, and two other inmates. Officer Franklin testified that the Defendant was "facing directly towards" the victim and that the two other inmates were facing each other "in kind of a boxed formation" with "their hands out to their sides."

Officer Franklin testified that the victim "was moving backwards, kind of back peddling away from the others." Eventually, the victim started to "run[] backwards," away from the Defendant and the other inmates. According to Officer Franklin, the Defendant "was swinging both hands pretty wildly at" the victim. Officer Franklin could not see if the Defendant had anything in his hands, but the Defendant's hands were "balled up." Officer Franklin saw a t-shirt in one of the victim's hands and testified that the victim appeared to be using it to try and "block the blows" from the Defendant. Officer Franklin testified that there were "a variety of reasons" that an inmate would wrap a t-shirt around his hand, including using it "to tie knives or weapons to [his] hands."

Officer Franklin exited the cage and turned "away for a brief moment to lock the door to the cage." When he turned back, Officer Franklin saw the victim fall to the floor in front of the cage. The Defendant and the other inmates "scattered out" when the victim fell. The Defendant ran up to the second floor of the unit. Officer Franklin testified that he saw a "lot

---

[2]This section will discuss only the factual background regarding the Defendant's conviction. The factual background of the Defendant's procedural issues will be discussed in other portions of this opinion.

[3]The trial court acquitted co-defendant Jordan of all charges at the close of the State's proof, and the jury convicted co-defendant Roberson of the lesser-included offense of facilitation of first degree premeditated murder. This court affirmed co-defendant Roberson's conviction and sentence on direct appeal. See State v. Brian Roberson, No. E2013-00376-CCA-R3-CD, 2014 WL 1017143 (Tenn. Crim. App. Mar. 14, 2014), perm. app. filed, (May 13, 2014).

of blood" coming from the victim's neck. The victim "appeared to be unconscious" and "was kind of making a gurgling sound." Officer Franklin attempted to put pressure on the victim's wound but it did not help. The victim's eyes "were pretty well fixed straight ahead," and he "was completely unresponsive." Officer Franklin testified that there were between thirty and forty inmates in the area but that when "the fight broke out most of them scattered and went back to their respective cells."

William West testified that he was an inmate at NECX on September 1, 2006, serving a sentence for an especially aggravated robbery conviction. Mr. West testified that he was on the upper level of Unit 12 when the victim was killed. Mr. West saw the Defendant approach the victim and "ask[ed the victim] to apologize for something that had occurred on the basketball court." The victim told the Defendant, "B---h, I ain't apologizing, do what you've got to do." The victim also told the Defendant that he was "just talking s--t" and would not do anything. According to Mr. West, the Defendant then went into one of the cells. Mr. West testified that the Defendant came out of the cell with two other inmates and that the three men "sprung on" the victim.

According to Mr. West, one of the inmates punched the victim and "knock[ed] him to the ground." Then the Defendant went to the victim's right and co-defendant Roberson went to the victim's left. Co-defendant Roberson "stuck" the victim in his chest, and the Defendant "stabbed him in the neck." Mr. West testified that after they stabbed the victim, the Defendant and co-defendant Roberson went upstairs, walked past him, wrapped the knives in a shirt, and dropped them into a trash can. Mr. West saw that the Defendant had a "prison shank" that was "ten to twelve inches long" and "skinny." Mr. West testified that the victim was "a rather large man," loud, and "arrogant." However, Mr. West testified that the victim did not have anything in his hands or wrapped around his hands when he was attacked. Mr. West also testified that the victim did not "yell" or say anything while the Defendant and the other inmates attacked him.

Mr. West admitted that he had recently been granted parole, but he claimed that he did not decide to testify until after the parole decision had been made. Mr. West testified that the prosecutor did not promise him anything in exchange for his testimony, but the prosecutor had stated that he would try to get Mr. West released earlier and moved to a different facility after the trial. Mr. West claimed that he did not agree to testify until a week before the trial because he was afraid of the Defendant and "his associates" and that he was "putting [his] life in jeopardy" by testifying. Mr. West admitted that he was talking with another inmate "about a drug deal" when he witnessed the victim's murder. Mr. West further admitted that he had trouble remembering things that were "not relevant" to him because he had "smoked a lot of pot."

Mr. West admitted on cross-examination that he was a former member of the Aryan Brotherhood, a white supremacist prison gang. The victim and all of the defendants in this case were African-Americans. Mr. West also admitted on cross-examination that he had given a statement to investigators but refused to sign it. Mr. West's statement did not mention what the victim had said to the Defendant because, Mr. West claimed, the investigator never asked him about what the victim said. Mr. West further admitted on cross-examination that he had written co-defendant Roberson's attorney and sent him an affidavit that "totally" contradicted what he testified to at trial. Mr. West claimed that he was lying in the affidavit and "forged" it to "protect" himself.

Steve Hannah was also an inmate at NECX on September 1, 2006. Mr. Hannah refused to testify at trial, so his preliminary hearing testimony was read to the jury. In his prior testimony, Mr. Hannah testified that he heard the victim call the Defendant a "b---h" during a basketball game. According to Mr. Hannah, the Defendant and co-defendant Roberson approached the victim inside the unit and told the victim "he'd better apologize or . . . there was going to be trouble." Mr. Hannah testified that the victim told the Defendant and co-defendant Roberson to "f--k themselves." The Defendant and co-defendant Roberson then "walked off." Mr. Hannah testified that he then saw the Defendant, co-defendant Roberson, and another inmate "coming down the steps" and that they "started confronting" the victim. Mr. Hannah testified that there was "a lot of commotion" during the confrontation.

Mr. Hannah testified that co-defendant Roberson and the third inmate started "exchanging blows" with the victim. Mr. Hannah saw co-defendant Roberson "slinging" something in his hand at the victim. Mr. Hannah also saw the third inmate "stick" the victim "a few times with something." The victim tried to back away from the three men, but he fell down. Mr. Hannah testified that when the victim fell down, the Defendant stabbed the victim in the neck with a big, "shiny" shank. The victim got up to run away but fell again. When the victim fell the second time the three men "took off and went the other way." Mr. Hannah testified that he did not see a weapon in the victim's hands and that he did not recall anyone wearing gloves during the altercation. Mr. Hannah testified that he was not promised anything in exchange for his testimony and that testifying had caused him "more problems than it's worth."

Captain Randy Lee testified that on September 1, 2006, he was the shift commander in charge of Unit 12 at NECX. Capt. Lee testified that shortly after the incident, he went to the cell the Defendant was being held in and asked the Defendant, "[D]o you know this inmate's dead down here?" The Defendant replied, "[Y]eah, I know he's dead I meant to kill him." Correctional officers found two shanks, gloves, a pair of shorts, and a shirt in a trash can on the upper level of the unit. The gloves were "wool brown gloves" that were "issued

-4-

to inmates for wintertime." One of the gloves was found "across the blade" of one of the shanks. Correctional officers also searched the cell belonging to the Defendant and co-defendant Roberson. A pair of size twelve and a pair of size ten-and-a-half shoes were found in the cell along with more gloves. It was established at trial that the Defendant wore size twelve shoes and that co-defendant Roberson wore a size ten-and-a-half.

The Defendant gave a statement to Tennessee Bureau of Investigation (TBI) Agent Franklin C. McCauley, Jr., on the night of September 1, 2006. The Defendant told Agent McCauley that the victim "basically was disrespecting" him during a game of basketball. The Defendant said that he "kept giving [the victim] chances to apologize, . . . but he wouldn't do it." Instead, the victim "just kept running his mouth." The Defendant told Agent McCauley that the victim accidently pushed him during the basketball game but that he "wasn't mad about it" until the victim "started talking about what [the Defendant] would do to him in return." The Defendant told the victim that he would tell the victim "to his face" if he had "intended to do anything."

The Defendant told Agent McCauley that he believed that the victim "thought all this was over once [they] went back inside the unit." Once inside, the Defendant "tried to get [the victim] to take back what he said." The victim told the Defendant that all he "ever talk[ed] about [was] killing somebody every time somebody foul[ed]" him. The Defendant then asked the victim if he "felt like [the Defendant] was threatening him." The victim told the Defendant that he felt threatened. The Defendant then told the victim that he was "not going to threaten someone and then not do anything about it." The Defendant told the victim that "he better start taking care of business and do something about it." The Defendant told Agent McCauley that he "stepped off towards [his] cell" on the upper level when the victim said that he was "going to do something about it."

The Defendant told Agent McCauley that, as he was walking to his cell, he saw the victim walk away from the table they had been sitting at but that he "didn't pay no [sic] attention to where he went." The Defendant further told Agent McCauley that he got his "shank" from his cell and described it as "a piece of metal about twelve inches long." When he came back downstairs, the Defendant saw the victim sitting at the table with "his shirt wrapped around his right hand." The Defendant told Agent McCauley that he kept his shank in his left pocket and covered it with his left hand. As he approached, the victim said "[W]hat's up, n----r." The Defendant responded, "I'm fixing to kill your ass." The victim tried to run, the Defendant told him, "[N]----r, there ain't no running," and pulled out his shank.

The Defendant told Agent McCauley that after he pulled out his shank, he saw that the victim "had a shank in his left hand." The Defendant said that the victim "about half

swung at [him] about waist level, but it was more like [the victim] . . . wanted to scare [him] with it." The Defendant said that he grabbed the victim's hand and took the victim's shank away from him. The Defendant told Agent McCauley that he was wearing gloves "to keep from cutting [his] hands." The Defendant said that he hit the victim and chased him around the unit while holding "knives in both hands." At one point, an inmate tried to stop the Defendant, and the Defendant "told him to get out of the way because [he] was still going to kill that n----r."

The Defendant told Agent McCauley that he was eventually able to trip the victim and that he tried to stab the victim in the heart but the victim "balled up on the floor." The Defendant stabbed the victim with the victim's shank, and when the victim turned to move, the Defendant stabbed the victim in the neck with the twelve-inch shank. The Defendant told Agent McCauley that when he pulled the shank out of the victim's neck, "blood squirted out and [he] jumped back." The victim tried to run, and the Defendant stabbed him in the shoulder. The victim then collapsed onto the floor. The Defendant said that he then walked to the upper level and put his right glove and both shanks in a trash can. The Defendant said that he hid his left glove and his clothes under his mattress in his cell. The Defendant told Agent McCauley that co-defendant Roberson "didn't have anything to do" with the murder.

Agent McCauley testified that there was a blood trail approximately fifty-two-feet long from where the victim was stabbed to where he eventually collapsed and died. Agent McCauley also testified that he did not see any wounds or injuries on the Defendant when he interviewed him. Jerry Gentry testified that he was the "compliance manager" at NECX and that he was present when Agent McCauley interviewed the Defendant. Mr. Gentry testified that the Defendant did not complain about any injuries during the interview. Mr. Gentry also testified about the NECX's telephone system. Mr. Gentry explained that all non-attorney calls made by inmates were recorded. Mr. Gentry further explained that each inmate used a unique personal identification number (PIN) to make phone calls and were limited to a list of ten pre-approved phone numbers they could call. The PIN number consisted of an inmate's Tennessee Department of Correction identification number and a four digit code.

Mr. Gentry played for the jury recordings of two calls made on September 7, 2006, that were made using the Defendant's PIN. In the first call, the Defendant spoke to a woman and told her that the victim had been "talking crazy," pulled a knife on him, and that he took the victim's knife and killed him. The woman asked the Defendant if it was self-defense and if he "got [sic] witnesses." Later in the call, the Defendant told the woman that the victim was threatening him and that the victim had pretended to walk away but "started sticking [him] with that little old knife of his." The Defendant reiterated that he took the knife from the victim and killed the victim with his own knife. The woman told the Defendant that he needed "some witnesses" to say that was what happened. The Defendant told her that there

were no witnesses because no one was "talking." The Defendant also stated that he knew his phone call was being recorded and that his co-defendants "didn't have nothing [sic] to do with it."

In the second phone call, the Defendant told a different woman that he killed the victim and that "nobody" helped him do it. The Defendant said that the victim had pushed him during a game of basketball, that he told the victim not to push him, and that the victim "kept talking that s--t." The Defendant also said that the victim was "kind of off." The Defendant told the woman that once he and the victim were back inside, he confronted the victim and that the victim pretended to walk away but pulled out a "little knife" and tried to stab him. The woman said that the Defendant should have "some more witnesses" because there were other inmates around. The Defendant responded that "they got a whole lot of folks saying this and that, you know, hating."

The Defendant also said that he did not "give a damn" because he had "double life plus forty-seven years, talk about doing something to [him, and he was] going to kill them." The Defendant told the woman that the victim said that the Defendant would threaten other inmates but would "never do it." Once inside, the victim said he wanted to fight the Defendant and was "talking about what he going to do." The Defendant said that he told the victim, "You ready to threaten me and fight me or something, I just want to make sure before I kill you that that's what you talking about." The Defendant said that he walked away, and when he came back downstairs, the victim pulled a "little knife" on him.

Doctor Teresa Campbell, an expert in forensic pathology, testified that she performed an autopsy on the victim's body. Dr. Campbell determined the cause of death to be multiple stab wounds. Dr. Campbell identified four stab wounds on the victim's body. The first was "in the right neck" and cut the victim's "right carotid artery causing a lot of bleeding." The next was "in the right chest" and cut the victim's aorta as well as perforated his right lung. The third was a wound "to the top of the right shoulder which went into the muscle." The fourth was "a shallow stab wound in the left upper arm." Dr. Campbell opined that the wounds to the victim's neck and chest "would have been the most immediately fatal." Dr. Campbell found that there was no bruising on the victim's body.

No fingerprints were found on either of the shanks recovered from the trash can on the second floor of Unit 12. Brad Everett, a TBI forensic scientist and expert in serology and DNA identification, testified that he examined several pieces of evidence for this case. Mr. Everett testified that both of the shanks had the victim's blood and DNA on them. The glove found in the trash can along with the shanks also had the victim's blood and DNA on it. Mr. Everett testified that he found traces of the Defendant's DNA inside the glove. The pair of shorts found in the trash can also had the victim's blood and DNA. Mr. Everett also testified

that the glove and pair of size twelve tennis shoes found in the Defendant's cell both had the victim's blood and DNA on them.

Based upon the foregoing evidence, the jury convicted the Defendant of first degree premeditated murder. The Defendant filed a timely motion for new trial, which the trial court denied. This appeal followed.

## ANALYSIS

### *I. Motion to Suppress*

The Defendant contends that the trial court erred in denying his motion to suppress his statement given to Agent McCauley. The Defendant argues that he "made an unequivocal request for an attorney before making . . . the statement." The Defendant also argues that Agent McCauley tricked him into signing a waiver of rights form. The State responds that the Defendant has waived this issue by failing to include it in his motion for new trial and that we should limit our review to plain error. However, the Defendant raised this issue in a timely filed amended motion for new trial; therefore, we will address the issue on its merits.

On August 18, 2011, the trial court held a hearing on the Defendant's motion to suppress at which Agent McCauley, Mr. Gentry, and the Defendant testified. Agent McCauley testified that he was told by Mr. Gentry that the Defendant wanted to speak with him. Agent McCauley testified that once he was in the interview room with the Defendant, he "went immediately into the Miranda warnings to let [the Defendant] know he did not have to talk unless he wanted to." Agent McCauley was "[a]bsolutely" sure he "went through [the Defendant's] Miranda rights before [the Defendant] gave his statement."

Agent McCauley testified that he "read every word with" the Defendant of the TBI's waiver of rights form prior to the Defendant's statement. According to Agent McCauley, the Defendant told him that he understood his rights and signed the waiver form. Agent McCauley testified that he did not use an audio recorder, so he wrote the Defendant's statement down and then reviewed it with the Defendant. Agent McCauley further testified that the Defendant signed the TBI's "sworn statement form," initialed the top and bottom of each page of the statement as well as any corrections in the document, and signed the last page of the statement. According to Agent McCauley, the Defendant "wanted to tell [him] his story." Agent McCauley testified that the Defendant never indicated that he did not want to speak with him or that he wanted an attorney.

-8-

Mr. Gentry testified that he was present when Agent McCauley interviewed the Defendant. Mr. Gentry testified that the first thing Agent McCauley did was go over the Defendant's Miranda rights. According to Mr. Gentry, Agent McCauley reviewed the rights waiver form with the Defendant, and the Defendant signed the form. Mr. Gentry testified that the Defendant never indicated that he did not want to speak with Agent McCauley or that he wanted an attorney.

The Defendant testified that he agreed to speak to Agent McCauley about "a homicide that occurred on the compound." According to the Defendant, Agent McCauley read him the waiver of rights form. The Defendant told Agent McCauley that he knew his rights but that he did not sign the form "just then." The Defendant testified that Agent McCauley then "pulled out another form with TBI on the top of it" and reviewed it with him. According to the Defendant, when Agent McCauley asked him to sign the forms, he told Agent McCauley he could not "sign that without no [sic] lawyer here if [they were] going to be talking about this homicide."

The Defendant claimed that Agent McCauley told him that he did not need a lawyer because he was not being arrested. The Defendant testified that he asked Agent McCauley when he would get a lawyer and that Agent McCauley told him one would be appointed when he was charged. The Defendant claimed that he again refused to sign the forms. According to the Defendant, Agent McCauley then said that he would just go over what he had heard about the murder and that the Defendant could correct him "if something [was] wrong." The Defendant testified that Agent McCauley pulled out an audio recorder and recorded the statement. The Defendant further testified that Agent McCauley tricked him into signing and initialing his statement as well as the waiver of rights form after the interview.

At the conclusion of the hearing, the trial court denied the Defendant's motion to suppress. The trial court accredited the testimony of Agent McCauley and Mr. Gentry over that of the Defendant. The trial court stated that significant portions of the statement contained information that only the Defendant could have known; therefore, he did not believe the Defendant's claim that Agent McCauley had fabricated the statement. The trial court also concluded that Agent McCauley had reviewed the Defendant's rights with him before the statement and that the Defendant had voluntarily waived those rights. The trial court stated that the Defendant knew "about these rights" and had "done that before."

On appellate review of suppression issues, the prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." State v. Talley, 307 S.W.3d 723, 729 (Tenn. 2010) (quoting State v. Odom, 928 S.W.2d 18, 23 (Tenn.

1996)). Questions about "the assessment of witness credibility, the weight and value of evidence, and the resolution of evidentiary conflicts are entrusted to the trial court" as the trier of fact. State v. Meeks, 262 S.W.3d 710, 722 (Tenn. 2008). When the trial court "makes findings of fact in the course of ruling upon a motion to suppress, those findings are binding on appeal unless the evidence in the record preponderates against them." Id. Additionally, a trial court's conclusions of law along with its application of the law to the facts are reviewed de novo without any presumption of correctness. Id.

A defendant's statements "made during the course of custodial police interrogation are inadmissible as evidence in a criminal case unless the State establishes that the defendant was advised of certain constitutional rights and waived those rights." State v. Anderson, 937 S.W.2d 851, 853 (Tenn. 1996) (citing Miranda v. Arizona, 384 U.S. 436, 444 (1966)). Pursuant to Miranda, warnings must be provided "to an accused when the accused is in custody and is subjected to interrogation or its functional equivalent." State v. Sawyer, 156 S.W.3d 531, 534 (Tenn. 2005) (citing Rhode Island v. Innis, 446 U.S. 291, 298 (1980)). It is clear from the record that the Defendant was in custody and subjected to interrogation by Agent McCauley.

There is no legal dispute as to whether the Miranda warnings were required before Agent McCauley interviewed the Defendant. Instead, the parties dispute whether the warnings were actually given and whether the Defendant waived his constitutional rights. The trial court heard testimony from Agent McCauley and Mr. Gentry that Agent McCauley reviewed the Miranda rights with the Defendant and that the Defendant waived his rights. Additionally, the Defendant signed a waiver of rights form, a "sworn statement" form, and signed and initialed the statement written by Agent McCauley. The trial court chose to accredit this evidence over the Defendant's testimony to the contrary. It was the province of the trial court to judge the credibility of the witnesses and weigh the evidence. As the evidence in the record does not preponderate against the trial court's findings, we will not disturb them on appeal. Accordingly, we conclude that the trial court did not err in denying the Defendant's motion to suppress.

*II. Dismissal of the Presentment*

The Defendant contends that the trial court erred in denying his motion to dismiss the presentment against him. The Defendant argues that the trial court lost jurisdiction when it "remanded" the case to the Johnson County General Sessions Court for a preliminary hearing. The State responds that the trial court was not required to grant the Defendant a preliminary hearing at that stage of the proceedings and was merely accommodating the Defendant's request for a preliminary hearing to use as a "tool for discovery" rather than using the hearing to determine probable cause. The State concludes that the trial court's

-10-

actions did not terminate its jurisdiction and necessitate a new indictment or presentment as the Defendant argues.

On April 3, 2007, the Johnson County Grand Jury returned a presentment charging the Defendant with first degree premeditated murder. There is no evidence in the record that the Defendant was arrested prior to the presentment being issued and the record does not contain an arraignment order. The Defendant filed a motion requesting a preliminary hearing on July 30, 2007, and an order sending the case to the Johnson County General Sessions Court for a preliminary hearing was filed on October 26, 2007. On March 19, 2008, a preliminary hearing was held in the general sessions court. A transcript of the preliminary hearing was not included in the record on appeal.

The Defendant filed a motion to dismiss the presentment on August 19, 2009, raising the same arguments he now raises on appeal. The trial court denied the Defendant's motion during the suppression hearing discussed above. The trial court stated that the preliminary hearing was done "to accommodate [the Defendant] and nothing more." The issue was raised again during the trial. The trial court told the Defendant that it "didn't have to give [him] a preliminary hearing" but that it did so for his benefit and "as a tool for discovery." The trial court stated that the preliminary hearing was "not in essence for probable cause" because the presentment "was already here and it was good." The trial court reiterated that the presentment "was never dismissed."

The Defendant relies upon Tennessee Rule of Criminal Procedure 5.1(b) to support his argument, which states as follows:

> When the magistrate at a preliminary examination determines from the evidence that an offense has been committed and there is probable cause to believe that the defendant committed it, the magistrate shall bind the defendant over to the grand jury and either release the defendant pursuant to applicable law or commit the defendant to jail by a written order.

Based upon Rule 5.1(b), the Defendant argues that the presentment against him should have been dismissed and his case bound over to the grand jury at the conclusion of the preliminary hearing.

However, when a grand jury returns a presentment it has "found probable cause for believing that the defendant committed the offenses charged therein." State v. Hudson, 487 S.W.2d 672, 674 (Tenn. Crim. App. 1972). Indeed, the "only function of the [g]rand [j]ury with reference to offenses and alleged offenses it investigates is to determine the question

-11-

of probable cause." Id.  Similarly, "the only purpose of a preliminary hearing is to determine whether there is probable cause to believe the accused committed the offense charged." Id.

This court has previously held as follows:

[T]o permit a preliminary hearing and a redetermination of the question of probable cause after return of an indictment or presentment would be intolerable.  If the magistrate or general sessions judge found probable cause it would be an idle gesture adding nothing to the validity or strength of the indictment or presentment.  On the other hand, a finding of no probable cause in such a preliminary hearing would not and could not invalidate and vacate the prior presentment . . . and discharge the accused.  The futility of such a procedure is plain.

Id. at 676.

Here, the preliminary hearing was held almost one year after the grand jury returned the presentment against the Defendant.  Because the grand jury had already determined that there was probable cause to charge the Defendant, there was no need for a preliminary hearing to readdress the issue.  As such, Rule 5.1(b), which contemplates the preliminary hearing occurring before the grand jury issues a presentment or indictment, was not applicable to the proceedings below.

We do note that Tennessee Rule of Criminal Procedure 5(e) provides that "[a]ny defendant arrested or served with a criminal summons prior to indictment or presentment for a misdemeanor or felony . . . is entitled to a preliminary hearing."  Rule 5(e) also provides that if an indictment or presentment is returned against a defendant who after arrest has not waived his right to a preliminary hearing before a preliminary hearing is held, "the circuit or criminal court shall dismiss the indictment or presentment on motion of the defendant filed not more than thirty days from the arraignment on the indictment or presentment." (Emphasis added).

However, the Defendant was already incarcerated at the time of the offense and the record contains no proof that the Defendant was arrested prior to the presentment being issued.  Furthermore, there is no evidence in the record that the Defendant requested a preliminary hearing within thirty days of his arraignment or that either the State or the trial court failed to act in good faith to comply with Rule 5(e). See Moore v. State, 578 S.W.2d 78, 82 (Tenn. 1979) (holding that the thirty-day limitation is tolled when either the State or the trial court fail to act in good faith in complying with the statutory precursor to Rule 5(e)).

-12-

As such, Rule 5(e) did not apply to the circumstances of this case. Accordingly, we conclude that this issue is without merit.

*III. Motion to Remove Appointed Counsel*

The Defendant contends that the trial court erred in denying his pro se motion to remove his appointed trial counsel. The Defendant argues that trial counsel was ineffective for failing to seek an interlocutory appeal of the trial court's denial of his motion to suppress his statement to Agent McCauley, failing to file requested pretrial motions, and failing to investigate possible witnesses. The State responds that the Defendant's motion was an attempt to delay the trial. The State further responds that the trial court considered the Defendant's motion and "found that there was no reason to remove counsel from the [D]efendant's case."

The Defendant filed a pro se motion to remove his appointed trial counsel on the first day of the trial. The trial court addressed the Defendant's motion at the start of the second day of the trial. Trial counsel informed the trial court that he attempted to meet with the Defendant a week before trial but was informed by the prison guards that the Defendant had "fired" him.

The Defendant complained that trial counsel refused his request to file an interlocutory appeal regarding the trial court's denial of his motion to suppress. The trial court informed the Defendant that a request for an interlocutory appeal would have been denied. The Defendant also complained that trial counsel refused his request to file a motion to have the trial judge recuse himself. Trial counsel stated that he had researched the issue and felt that there was no legal basis for the motion. The Defendant made no arguments regarding his claim that trial counsel failed to investigate potential witnesses.

The trial court stated that the "last indication" it had from the Defendant was that "there was no problem with [trial counsel's] representation." The trial court concluded that the Defendant's refusal to speak or cooperate with trial counsel as well as filing the motion to have him removed the first day of the trial were "delay tactic[s]." The trial court further concluded that trial counsel was "a good lawyer" and had spent a significant amount of time preparing for the trial. The Defendant stated at the conclusion of the hearing that trial counsel "seem[ed] like a good lawyer."

Both the United States and the Tennessee Constitutions guarantee an indigent criminal defendant the right to assistance of counsel at trial. U.S. Const. amend VI; Tenn. Const. art. I, § 9. However, this right "does not include the right to appointment of counsel of choice, or to special rapport, confidence, or even a meaningful relationship with appointed counsel."

-13-

State v. Carruthers, 35 S.W.3d 516, 546 (Tenn. 2000). Put another way, the "essential aim" of the right to counsel "is to guarantee an effective advocate, not counsel preferred by the defendant." Id.

To that end, trial courts have wide discretion regarding the appointment and relief of counsel for indigent defendants, and a trial court's decision in such a matter "will not be set aside on appeal unless it is shown that there was a plain abuse of that discretion." State v. Rubio, 746 S.W.2d 732, 737 (Tenn. Crim. App. 1987). To be successful on a motion to remove counsel, a defendant must show that "(a) the representation being furnished by counsel is ineffective, inadequate, and falls below the range of competency expected of defense counsel in criminal prosecutions, (b) the accused and appointed counsel have become embroiled in an irreconcilable conflict, or (c) there had been a complete breakdown in communications between them." State v. Gilmore, 823 S.W.2d 566, 568-69 (Tenn. Crim. App. 1991).

A trial court "may deny a request for substitution [of counsel] made on the eve of trial or the morning of the trial absent a showing of good cause." Gilmore, 823 S.W.2d at 569 (internal footnotes omitted). Here, the Defendant waited until the first day of trial to file his motion to remove appointed trial counsel. Absent his refusal to speak to trial counsel the week before trial, there is no evidence in the record to demonstrate that trial counsel and the Defendant were embroiled in an irreconcilable conflict or that there had been a complete breakdown in their communications. In fact, the record reflects that the Defendant actively participated in his defense and communicated with trial counsel both before and after the trial court's denial of his motion.

With respect to the Defendant's claims that trial counsel was ineffective, we note that interlocutory appeals "to review pretrial orders or rulings are generally 'disfavored,' especially in criminal cases." Reid v. State, 197 S.W.3d 694, 699 (Tenn. 2006). In light of our above discussion of the Defendant's suppression issue, the trial court was correct that the Defendant failed to meet the criteria for interlocutory review. See Tenn. R. App. P. 9. As for the Defendant's remaining claims, trial counsel stated that he did not believe there was a legal basis for the Defendant's requested motion to recuse the trial judge, and the Defendant presented no evidence regarding his claim that trial counsel failed to investigate potential witnesses. As such, we agree with the trial court's assessment that trial counsel was effective and that the Defendant's motion was ultimately a delay tactic. Accordingly, we affirm the trial court's denial of the Defendant's motion to remove appointed trial counsel.

*IV. Disclosure of Defendant's Incriminating Statement*

-14-

The Defendant contends that the State failed to disclose an incriminating statement made by the Defendant to Capt. Lee. The Defendant argues that defense counsel was not informed "until moments before [Capt. Lee] was to be called to the stand" that Capt. Lee would testify that the Defendant stated he meant to kill the victim. The Defendant argues that the State's failure to disclose the statement violated various procedural rules and prejudiced his defense. The State responds by arguing that it was not required to disclose Capt. Lee's statement and that the Defendant has waived this issue by failing to contemporaneously object to the testimony. Following our review, we determine that the record clearly belies the Defendant's assertion that defense counsel was not informed of the incriminating statement "until moments before" Capt. Lee testified.

Capt. Lee testified at the December 12, 2011 trial that he asked the Defendant, "[D]o you know this inmate's dead down here" and that the Defendant replied, "[Y]eah, I know he's dead I meant to kill him." Prior to the start of the suppression hearing on August 18, 2011, defense counsel stated that he had filed a motion for the State to provide him "with evidence of any other statements that might have been made" by the Defendant. The trial court asked the prosecutor if he was aware of any other statements by the Defendant. The prosecutor responded that he had informed defense counsel that morning that a prison officer had approached the Defendant after the murder and asked him "what's going on" and that the Defendant had said "something inculpatory very briefly." The trial court asked defense counsel if he had any "question about that," and defense counsel responded that he did not.

Just before Capt. Lee was called to testify, defense counsel told the trial court that Capt. Lee was "going to testify to something that [the Defendant] said" and objected to Capt. Lee testifying because he had not had a chance to interview him. Defense counsel explained that Capt. Lee had been unavailable because he had "knee surgery" prior to trial. The trial court stated that it would call a recess to allow defense counsel to interview Capt. Lee. At the conclusion of the recess, the trial court asked defense counsel if he was ready, and defense counsel responded that he was. Capt. Lee then testified as to the Defendant's incriminating statement, and the Defendant made no objection to the testimony.

On cross-examination, defense counsel asked Capt. Lee if he had spoken to the Defendant about "what the argument [with the victim] was about." Capt. Lee responded that he and another prison officer had spoken with the Defendant about that. At that point, defense counsel objected because he "didn't know [it] was coming" and that the fact Capt. Lee had spoken to the Defendant about his argument with the victim "wasn't on the witness list." The trial court stated that Capt. Lee was on the witness list, and defense counsel responded, "just for that one comment that he overheard." Defense counsel then complained that Capt. Lee "didn't say anything about this" during their conversation in the hallway. The

trial court advised defense counsel to "[j]ust stay away from that" and then instructed the jury to disregard the last question and response.

It is clear from the record that defense counsel had been informed four months prior to the trial that Capt. Lee was going to testify about the Defendant's incriminating statement. Defense counsel repeatedly stated that he was aware Capt. Lee was going to testify about "something [the Defendant] said" and made no objection to Capt. Lee's testimony about the statement. It was not until the motion for new trial that defense counsel claimed that he believed that Capt. Lee was to testify about a chain of custody issue and that he had not been informed about the Defendant's incriminating statement until just before Capt. Lee testified. Defense counsel claimed at the motion for new trial hearing that he had objected to Capt. Lee's testimony because he had not been informed about the content of Capt. Lee's testimony.

However, the record belies these assertions. Defense counsel did not object to the Defendant's incriminating statement. Rather, he was not informed about and objected to Capt. Lee's possible testimony regarding another matter, a conversation Capt. Lee had with the Defendant regarding what the Defendant's argument with the victim was about. There were no violations of any procedural rules because the State disclosed the Defendant's statement well before trial and defense counsel was given an opportunity to interview Capt. Lee before he testified. Furthermore, the Defendant made no objection to Capt. Lee's testimony regarding his incriminating statement. See Tenn. R. App. P. 36(a) (stating that "[n]othing in this rule shall be construed as requiring relief to be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"). Accordingly, we conclude that this issue is devoid of any merit.

*V. Admission of Prison Phone Calls*

The Defendant contends that the trial court erred in admitting audio recordings of two phone calls he made while in prison. The Defendant argues that the recordings were not properly authenticated because no one identified his voice on the recordings. The Defendant also argues that the recordings were inadmissible because the State failed to provide notice of its intent to use the recordings. The Defendant further argues that a statement on the recordings that there should be witnesses to support his claim of self-defense improperly shifted the burden of proof onto the Defendant. Finally, the Defendant argues that his statement that he was serving "double life plus forty-seven years" was impermissible evidence of prior criminal acts.

The State responds that the recordings were properly authenticated. The State also responds that the Defendant was provided with copies of the audio recordings almost a month before the trial began and that the State provided him with notice of its intent to use the recordings after the prosecutor had reviewed them. The State further responds that the Defendant has waived our review regarding his claim that a comment on the recordings shifted the burden of proof because the Defendant did not raise this objection at trial. Finally, the State responds that the Defendant's statement regarding his sentence of "double life plus forty-seven years" was admissible.

## A. Authentication

Tennessee Rule of Evidence 901(a) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." Subsection (b) of Rule 901 provides a list "[b]y way of illustration only, and not by way of limitation" of examples of authentication which would satisfy the rule. One of these is "[i]dentification of a voice . . . by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker." Tenn. R. Evid. 901(b)(5). However, that is not the only means by which an audio recording of a phone call may be authenticated.

In State v. Hinton, 42 S.W.3d 113, 127 (Tenn. Crim. App. 2000), a panel of this court held that an audio recording of a 911 phone call had been properly authenticated when the custodian of the recording explained the process by which the recording was "processed and retrieved," stated the time and date of the phone call, and the address associated with the phone number from which the phone call originated. Here, Mr. Gentry, the "compliance manager" at NECX, testified about NECX's telephone system and the process for recording inmate phone calls. Mr. Gentry explained that each inmate had an unique PIN used to make calls to a pre-approved list of phone numbers. Mr. Gentry testified that the phone calls at issue were made using the Defendant's PIN. Accordingly, we conclude that the audio recordings were properly authenticated pursuant to Rule 901.

## B. Disclosure of Intent to Use at Trial

Prior to trial, the Defendant filed a motion in limine to exclude the audio recordings because the State did not give him notice of its intent to use the recordings until four days before the trial was scheduled to begin. The Defendant did not request a continuance to review the recordings but, rather, requested that the trial court exclude them due to their late disclosure. It was determined at the motion for new trial hearing that copies of the recordings were given to defense counsel pursuant to a court order on November 18, 2011,

almost a month before the trial began but that the State did not provide notice of its intent to use the recordings until four days before the trial began. At the motion for new trial hearing, the prosecutor stated that he got a copy of the recordings on the same day as defense counsel and that he did not listen to them until the week before trial. The prosecutor stated that once he listened to the recordings, he "immediately" notified defense counsel of his intent to use them at trial.

Tennessee Rule of Criminal Procedure 12(d)(2) requires that, upon a defendant's request, the State will provide the defendant notice of its "intent to use (in evidence in chief at trial) any evidence that the defendant may be entitled to discover under Rule 16." The purpose of Rule 12(d)(2) "is to afford the accused an opportunity to suppress any evidence that (a) the State intends to use in its case-in-chief and (b) is discoverable pursuant to Rule 16." State v. Fredrick Arnaz Miller, No. E2005-01583-CCA-R3-CD, 2006 WL 2633211, at *15 (Tenn. Crim. App. Sept. 14, 2006), perm. app. denied, (Tenn. Jan. 29, 2007). Rule 12(d)(2) "contemplates that the State will provide the defendant with specific information concerning the evidence." Id.

The exclusion of evidence is generally "a drastic remedy and should not be implemented unless there is no other reasonable alternative." Miller, 2006 WL 2633211 at *15. "In considering discovery violations, the important inquiry is what prejudice has resulted from the discovery violation, not simply the prejudicial effect the evidence, otherwise admissible, has on the issue of a defendant's guilt." Id.

The State and the Defendant received the audio recordings at the same time, November 18, 2011. This was approximately a month before the trial was to begin. The prosecutor stated that he did not listen to the recordings until four days before trial. After listening to the recordings, he notified defense counsel of his intent to use them at trial. As such, the Defendant had a copy of the recordings well in advance of trial and was informed of the State's intent to use them as soon as the prosecutor made his decision. Additionally, the Defendant did not request a continuance and has not shown any evidence of prejudice resulting from the timing of the notice. Accordingly, we conclude that this issue is without merit.

*C. Shifting the Burden of Proof*

The Defendant argues that statements by one of the women on the recordings that there should be witnesses to support his claim of self-defense improperly shifted the burden of proof onto him. However, the Defendant did not raise this argument in a contemporaneous objection at trial. Therefore, the Defendant has waived our review of this issue. See Tenn. R. Evid. 103(a)(1) (stating that error "may not be predicated upon a ruling

which admits . . . evidence unless a substantial right of the party is affected" and "a timely objection . . . appears of record, stating the specific ground of objection").

## D. Evidence of Prior Crimes

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that person's actions were in conformity with the character trait. Tenn. R. Evid. 404(b). This rule "is based on the recognition that such evidence easily results in a jury improperly convicting a defendant for his or her bad character or apparent propensity or disposition to commit a crime regardless of the strength of the evidence concerning the offense on trial." State v. Rickman, 876 S.W.2d 824, 828 (Tenn. 1994) (citing Anderson v. State, 56 S.W.2d 731 (Tenn. 1933)). The danger of a jury improperly convicting a defendant based on their character rather than the evidence presented at trial "particularly exists when the conduct or acts are similar to the crimes on trial." Id. (citing State v. Parton, 694 S.W.2d 299, 303 (Tenn. 1985)).

Accordingly, Rule 404(b) is generally one of exclusion, but exceptions to the rule may occur when the evidence of the otherwise inadmissible conduct is offered to prove the motive of the defendant, identity, intent, the absence of mistake or accident, opportunity, or a common scheme or plan. State v. Tolliver, 117 S.W.3d 216, 230 (Tenn. 2003); State v. McCary, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003). In addition to these exceptions, evidence of other acts may be admitted to provide the jury with necessary contextual background. State v. Gilliland, 22 S.W.3d 266, 272 (Tenn. 2000); see also NEIL P. COHEN ET AL., TENNESSEE LAW OF EVIDENCE § 4.04[13] (6th ed. 2011) (evidence admissible to tell the "complete story").

Rule 404(b) requires the court to hold a jury-out hearing regarding the admissibility of specific instances of conduct "upon request." Tenn. R. Evid. 404(b)(1). In order to determine the admissibility of a prior bad act, the trial court should consider the following three factors: (1) whether a material issue other than conduct conforming with a character trait exists supporting admission of the prior act; (2) whether proof of the prior act is clear and convincing; and (3) whether the probative value of the evidence is not outweighed by the danger of unfair prejudice. Tenn. R. Evid. 404(b)(2)-(4). If these three thresholds are met, the evidence may be admitted. We review a trial court's ruling on evidentiary matters under Rule 404(b) for abuse of discretion, provided the trial court has substantially complied with the procedural prerequisites of the rule. State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997).

Prior to trial, the Defendant filed a motion for notice of all possible Rule 404(b) evidence and requesting a hearing regarding any such evidence. The Defendant also filed

a pretrial motion objecting to the admission of the audio recordings on the grounds that his statement about having "double life plus forty-seven years" was "inadmissible and extraordinarily prejudicial." The trial court did not hold a jury-out hearing regarding the admissibility of the statement despite the Defendant's pretrial request. As such, the trial court's decision is not afforded the deference of the abuse of discretion standard of review. See DuBose, 953 S.W.2d at 652.

There was no material issue other than conduct conforming with a character trait to support admission of the Defendant's statement that he was serving a sentence of "double life plus forty-seven years." While other statements in the record phone conversations could be viewed as evidence of the Defendant's intent and premeditation to kill the victim, the statement regarding his sentence served no other purpose than to inform the jury that the Defendant was serving three lengthy sentences. We agree with the Defendant's argument that the jury could easily extrapolate from his statement that he had previously been convicted of murder. Therefore, any probative value of the statement was outweighed by the danger of unfair prejudice. Accordingly, we conclude that it was error to admit the Defendant's statement that he was serving "double life plus forty-seven years."

However, this does not end our inquiry. The Tennessee Rules of Appellate Procedure provide for harmless error review in such cases. See Tenn. R. App. P. 36(b). Errors in the admission of evidence are typically considered non-constitutional. State v. Rodriguez, 254 S.W.3d 361, 375 (Tenn. 2008). As such, "Tennessee law places the burden on the defendant who is seeking to invalidate his or her conviction to demonstrate that the error 'more probably than not affected the judgment or would result in prejudice to the judicial process.'" Id. at 372 (quoting Tenn. R. App. P. 36(b)). "[T]he line between harmless and prejudicial error is in direct proportion to the degree . . . by which proof exceeds the standard required to convict." State v. Moore, 6 S.W.3d 235, 242 (Tenn. 1999). As will be discussed in detail below, the evidence was overwhelming that the Defendant not only killed the victim but did so with premeditation. Accordingly, we conclude that the trial court's error in admitting the Defendant's statement regarding his sentence was harmless.

*VI. Admission of Autopsy Photograph*

The Defendant contends that the trial court erred in admitting an autopsy photograph of the victim. The Defendant argues that the photograph was not relevant and that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice. The State responds that the Defendant has waived our review of this issue by failing to object to the admission of the photograph.

Prior to trial, the Defendant filed a motion "to prohibit display of photographs of [the] victim either before or after death." At the suppression hearing, defense counsel stated that he and the prosecutor could "generally [] come to some agreement concerning that." The trial court instructed the State and the Defendant to "look at" the photographs and to let it "know which ones [they could not] agree on . . . unless [they got] them all agreed to." The trial court stated that it would address the issue again if the parties could not come to an agreement. In its order addressing the Defendant's pretrial motions, the trial court stated that the Defendant's motion was "hereby reserved and it is requested that the motion be re-raised prior to trial."

During Dr. Campbell's testimony at trial, the State introduced a photograph from the victim's autopsy. The photograph was of the victim's upper body and showed the stab wounds to his neck and chest. When presenting the photograph to Dr. Campbell, the prosecutor stated that he had "shown [it] to defense counsel previously." The Defendant made no objection to the photograph's admission or its publication to the jury.

Tennessee Rule of Evidence 103(a)(1) provides that error "may not be predicated upon a ruling which admits . . . evidence unless a substantial right of the party is affected" and "a timely objection . . . appears of record, stating the specific ground of objection." Prior to trial, the Defendant filed a blanket objection to all photographs of the victim. At the suppression hearing, defense counsel told the trial court that he was close to an agreement with the prosecutor on the issue. The trial court instructed the parties to attempt to come to an agreement and to raise the issue again if they could not. The issue was not raised again, and the Defendant made no objection to the admission of the photograph during Dr. Campbell's testimony. Based upon the foregoing, we conclude that the Defendant has waived our review of this issue by failing to raise a contemporaneous objection to the photograph.

*VII. Unavailable Declarant Exception to the Hearsay Rule*

The Defendant contends that the trial court erred in determining that Mr. Hannah was an unavailable declarant and allowing his preliminary hearing testimony to be read to the jury. The Defendant argues that Mr. Hannah was not unavailable to testify during the trial. The Defendant further argues that the use of Mr. Hannah's preliminary hearing testimony violated his Sixth Amendment right to confrontation because the "motive for cross-examination [at trial] was vividly different from the preliminary hearing, which was focused solely on discovery." The State responds that the trial court properly declared Mr. Hannah to be unavailable. The State further responds that this court has previously rejected the Defendant's argument that the motive to cross-examine witnesses differs between a preliminary hearing and a trial.

The State called Mr. Hannah to testify at trial. Mr. Hannah stated that he had spoken to the prosecutor the week before trial and informed him that he did not want to testify. Mr. Hannah told the trial court that he "was brought [there] against [his] will to testify," that the prosecutor had "no regard for [his] or [his] family's life," and that he wanted to "recant any statement or testimony" he had given "in the past." Mr. Hannah then told the trial court that he wished to "plead the Fifth" and refused to answer any questions. The trial court informed Mr. Hannah that his Fifth Amendment right against self-incrimination only applied when his testimony could implicate him in a crime.

The trial court then asked Mr. Hannah if he would testify if it ordered him to do so. Mr. Hannah responded, "You can lock me up and you can have me after these twenty-five years I've got to do." The trial court ordered Mr. Hannah to testify and warned him that if he did not it would find him in contempt of court and add ten days to his sentence. Mr. Hannah again refused to testify. The trial court found Mr. Hannah to be in contempt of court and sentenced him to ten days for the contempt. All three of the defendants objected to the use of Mr. Hannah's preliminary hearing testimony. The trial court overruled the objections, but it did allow the defendants to attempt to cross-examine Mr. Hannah. Mr. Hannah refused to answer their questions.

"Hearsay" is defined as "a statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). A "statement" is "(1) an oral or written assertion or (2) nonverbal conduct of a person if it is intended by the person as an assertion." Tenn. R. Evid. 801(a). Hearsay is not admissible except as allowed by the rules of evidence or other applicable law. Tenn. R. Evid. 802. One of these exceptions allows for the use of former testimony given by an unavailable declarant. Tenn. R. Evid. 804(b)(1). The definition of "unavailability" includes situations where the declarant "persists in refusing to testify concerning the subject matter of the declarant's statement despite an order of the court to do so." Tenn. R. Evid. 804(a)(2). Here, Mr. Hannah was clearly an unavailable declarant as he refused to testify despite the trial court's order to do so.

With respect to the Defendant's argument that he did not have a similar motive to cross-examine Mr. Hannah at the preliminary hearing, we note that this exact argument regarding Mr. Hannah's preliminary hearing testimony was made by co-defendant Roberson in his direct appeal to this court. State v. Brian Roberson, No. E2013-00376-CCA-R3-CD, 2014 WL 1017143, at *6-7 (Tenn. Crim. App. Mar. 14, 2014). In that opinion, a panel of this court held that the motive for cross-examining Mr. Hannah at the preliminary hearing was similar to the motive for cross-examining him at trial, "to negate [co-defendant Roberson's] culpability for the offense charged." Id. at *7. We agree with and adopt the

conclusions made by this court in that opinion. Accordingly, we conclude that the Defendant is not entitled to relief on this issue.

## *VIII. Sufficiency of the Evidence*

The Defendant contends that the evidence was insufficient to sustain his conviction for first degree premeditated murder. The Defendant argues that the State failed to prove the element of premeditation. The Defendant also argues that the evidence established that he acted in self-defense. The State responds that the evidence was sufficient to establish the element of premeditation and that the jury was properly charged and rejected the Defendant's claim of self-defense.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Bland, 958 S.W.2d at 659; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's proof be uncontroverted or perfect." State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 326.

The following standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Our supreme court has held that circumstantial evidence is as probative as direct evidence. State v. Dorantes, 331 S.W.3d 370, 379-81 (Tenn. 2011). In doing so, the supreme court rejected the previous standard which "required the State to prove facts and circumstances so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond

a reasonable doubt." Id. at 380 (quoting State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971)) (quotation marks omitted).[4]

Instead, "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Dorantes, 331 S.W.3d at 381. The reason for this is because with both direct and circumstantial evidence, "a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference . . . [and] [i]f the jury is convinced beyond a reasonable doubt, we can require no more." Id. at 380 (quoting Holland v. United States, 348 U.S. 121, 140 (1954)). To that end, the duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

As relevant here, first degree premeditated murder is defined as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a).

> Premeditation is an act done after the exercise of reflection and judgment. Premeditation means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time.

Tenn. Code Ann. § 39-13-202(d) (internal quotations omitted).

The element of premeditation only requires the defendant to think "about a proposed killing before engaging in the homicidal conduct." State v. Brown, 836 S.W.2d 530, 541 (Tenn. 1992). The presence of premeditation is a question for the jury and may be established by proof of the circumstances surrounding the killing. Bland, 958 S.W.2d at 660. Our supreme court has held that factors demonstrating the existence of premeditation include, but are not limited to, the following: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, destruction or secretion of evidence of the killing, and calmness immediately after the killing.

---

[4]In his brief, the Defendant cites to the standard from Crawford despite it having been expressly overruled by our supreme court over three years ago and this court's repeated warnings that Crawford "is no longer representative of the current state of the law in Tennessee." State v. Deborah Davis, No. E2011-01519-CCA-R3-CD, 2012 WL 6727512, at *11 (Tenn. Crim. App. Dec. 27, 2012), perm. app. denied, (Tenn. May 8, 2013).

See State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003); Bland, 958 S.W.2d at 660. Additional factors cited by this court from which a jury may infer premeditation include lack of provocation by the victim and the defendant's failure to render aid to the victim. See State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000).

Here, the Defendant and the victim engaged in an altercation during a game of basketball. The Defendant and the victim continued their argument inside the prison unit despite admitting in his own statement that he believed that the victim "thought all this was over." After speaking to the victim, the Defendant went back to his cell and procured a shank and gloves to protect his hands. The Defendant then approached the victim and told him that he was "fixing to kill [his] ass." There was conflicting evidence as to whether the victim had a shank in his hand, but in his statement, the Defendant stated that he was unaware that the victim was armed until after he had attacked the victim. The Defendant then chased the victim as the victim attempted to flee and told another inmate to get out of his way because he "was still going to kill that n----r." The Defendant stabbed the victim in the neck and chest. Once the victim collapsed, the Defendant fled back to his cell and attempted to conceal the shank as well as other evidence of the crime. Immediately after the killing, the Defendant told Capt. Lee that he "meant to kill" the victim. Accordingly, we conclude that there was sufficient evidence to establish the element of premeditation.

With respect to the Defendant's argument that he killed the victim in self-defense, Tennessee law provides that a person may use deadly force in self-defense when that person has a reasonable belief, based upon reasonable grounds, that there is an imminent, real danger of death or serious bodily injury. Tenn. Code Ann. § 39-11-611(b)(2). It is well established, under Tennessee law, "that whether an individual acted in self-defense is a factual determination to be made by the jury as the sole trier of fact." State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997) (citing State v. Ivy, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993)).

There was conflicting evidence as to whether the victim was armed with a shank before he was killed. Officer Franklin, Mr. West, and Mr. Hannah all testified that they did not see anything in the victim's hand. Officer Franklin testified that it was not uncommon for an inmate to wrap his shirt around his hand to help hold a shank and that the victim had a shirt wrapped around his hand. However, Officer Franklin also testified that the victim was using the shirt to attempt to block the Defendant's blows. In his statement to Agent McCauley, the Defendant stated that he got his shank and attacked the victim before he noticed that the victim was armed with his own shank. Only in phone calls made several days later did the Defendant claim that the victim pretended to walk away, attacked him with a "little knife," and that he took the victim's weapon and killed him with it. However, in one of those phone calls, the Defendant also stated that if anyone talked "about doing something

to [him, he was] going to kill them." Based upon the foregoing evidence, we conclude that it was well within the province of the jury to reject the Defendant's claim of self-defense.

## IX. State's Closing Argument

The Defendant contends that the State committed prosecutorial misconduct during its closing argument. The Defendant argues that he is entitled to a new trial because the prosecutor intentionally misstated the evidence during his rebuttal argument. The State responds that "the prosecutor properly argued the facts in this case" and that the Defendant has failed to show that the alleged misstatement negatively affected the outcome of the trial against him.

During his rebuttal argument, the prosecutor made the following statement:

> Let's go onto self-defense, that's what [defense counsel] wants to talk about, that somehow this event on [the Defendant's] part is self-defense, survival of the fittest in prison. [Defense counsel] says, this could have been avoided if the victim had just apologized. Nothing could have been avoided had that shank not been procured from wherever it was stored and brought to [the victim]. [Defense counsel] says, [the victim] started this altercation. All you have in this evidence is what [the Defendant] says about it. You don't know what [the victim] would have to say.

At that point, defense counsel objected stating, "I believe that's a misstatement of the facts if you look through Mr. Hannah's statement. He was on that basketball court and his testimony said so, and he heard what was said out there." The trial court instructed the jury that "if any lawyer makes any statements that are outside the facts you're to disregard it. You'll decide this case from the proof."

The argument of counsel "is a valuable privilege that should not be unduly restricted." Smith v. State, 527 S.W.2d 737, 739 (Tenn. 1975). Accordingly, "[a]ttorneys have great leeway in arguing before a jury, and the trial court's broad discretion in controlling their arguments will be reversed only upon an abuse of discretion." State v. Scarborough, 300 S.W.3d 717, 731 (Tenn. Crim. App. 2009) (citing Terry v. State, 46 S.W.3d 147, 156 (Tenn. 2001)). Our supreme court has stated that a criminal conviction should not be lightly overturned solely on the basis of the prosecutor's closing argument. State v. Banks, 271 S.W.3d 90, 131 (Tenn. 2008); see also State v. Bane, 57 S.W.3d 411, 425 (Tenn. 2001) (holding that a prosecutor's improper closing argument does not automatically warrant reversal). "An improper closing argument will not constitute reversible error unless it is so

inflammatory or improper that it affected the outcome of the trial to the defendant's prejudice." Id.

One general area of potential prosecutorial misconduct related to closing argument is when a prosecutor intentionally misstates the evidence or misleads the jury as to the inferences it may draw from the evidence. State v. Sexton, 368 S.W.3d 371, 419 (Tenn. 2012). However, the prosecutor did not misstate the evidence during his rebuttal argument. Mr. Hannah testified that he overheard the victim call the Defendant a "b---h" on the basketball court and that when the Defendant asked the victim to apologize once they were back inside the prison, the victim told the Defendant to "f--k " himself. Mr. Hannah testified that the Defendant then walked away, came back to the victim, and "started confronting" the victim.

It is unreasonable to suggest, as the Defendant does, that the victim calling the Defendant a b---h and telling him to f--k himself, even in the context of a prison, caused the Defendant to fear an imminent, real danger of death or serious bodily injury from the victim. See Tenn. Code Ann. § 39-11-611(b)(2). As such, Mr. Hannah's testimony did not provide any evidence to support the Defendant's claim of self-defense. Furthermore, even if the prosecutor misstated the evidence, there is no proof that he did so intentionally. When the prosecutor made the statement at issue, he was attempting to establish that the victim could not tell his side of the story because he was dead rather than to obfuscate evidence supporting the Defendant's claim of self-defense. Accordingly, we conclude that this issue is without merit.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE